**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| SEACHANGE PROJECTS LLC | : | CIVIL ACTION |
| 2835 El Prado Boulevard | : | |
| Miami, FL  33133-6442, | : | NO.  1:14-cv-01186-GMS |
| | : | |
| Plaintiff, | : | |
| v. | : | |
| | : | |
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Defendant. | : | |

## SECOND AMENDED COMPLAINT

For its Second Amended Complaint[1] against Defendant United States of America

("USA"), acting by and through the Department of the Navy's Military Sealift Command

("MSC"), Plaintiff SeaChange Projects LLC ("SeaChange"), through its undersigned counsel,

herewith alleges as follows:

1.       This is an action under the Contract Disputes Act ("CDA"), 41 USC §§7101-

7109, and the Suits in Admiralty Act ("SIAA"), 46 USCA §30901, *et seq.*, pertaining to the

improper default termination and consequent breach by Defendant of a contract for ocean

transportation services existing between Defendant and Plaintiff SeaChange.

## PARTIES

2.       Plaintiff SeaChange is a Delaware Limited Liability Company, with its principal

place of business located in Miami, FL.  Plaintiff is and has at all relevant times been in the

business of providing ocean transportation and related marine services.  Plaintiff was the owner

of the Motor Vessel CAPT DAVID I LYON (ex-M/V/POSITANO) (the "Vessel"), a ship

---

[1] Attached hereto as "Exhibit 1" is a redline comparison to highlight the differences between Plaintiff's First
Amended Complaint and this Second Amended Complaint

specifically procured and converted by SeaChange to meet the Defendant's contractual requirements.

3.      The MSC is an instrumentality of the government of the Defendant United States of America, a sovereign nation which has consented to be sued under both the CDA and the SIAA.

## JURISDICTION AND VENUE

4.      This is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure.

5.      This Court has subject matter jurisdiction over this action pursuant to 28 USC §1333, as this action pertains to the breach of a maritime contact; the Suits in Admiralty Act, 46 USCA §30901, *et seq*., by which act Defendant USA has waived its sovereign immunity; and the CDA, 41 USC §7102, as this matter pertains to a contractual dispute between the parties.

6.      Venue is proper in this Court per 46 USCA §30906 in that Plaintiff is a corporation formed under Delaware law and is therefore a resident in this District.

## RELIEF SOUGHT

7.      Based upon the allegations below and the relevant law, Plaintiff seeks the Court's declaratory judgment that:

  a.   Under the factual circumstances and terms of the below-identified Contract, a Termination for Default was unwarranted, wrongful and improper;

  b.   By issuing a wrongful and unjustified Termination for Default, MSC breached the Contract;

  c.   The Termination for Default must be converted to a Termination for Convenience under the terms of the Contract;

d.  By failing to cooperate and assist Plaintiff to obtain the necessary Facility
    Security Clearance, or interim relief pending issuance of the necessary
    Facility Security Clearance, MSC breached its legal duty of good faith and
    fair dealing;

e.  By failing to cooperate and assist Plaintiff to obtain the necessary Facility
    Security Clearance, or interim relief pending issuance of the necessary
    Facility Security Clearance, MSC breached its legal duty to cooperate with its
    contractor;

f.  By failing to disclose its superior knowledge that a Facility Security Clearance
    would not be issued by the government in time to meet the contract
    requirements, while continuing to direct and induce Plaintiff to continue with
    contract performance, MSC acted in bad faith;

g.  By threatening to terminate the contract for default unless Plaintiff sold its
    Vessel to allow MSC to novate the contract to another contractor, MSC acted
    in bad faith;

h.  By terminating Plaintiff's contract for "default" despite admitting that
    Plaintiff acted with diligence in obtaining a Facility Security Clearance, and
    with full knowledge that such termination would cause Plaintiff significant
    and oppressive damages, MSC acted in bad faith;

i.  Because MSC knew that the issuance of a Facility Security Clearance to
    SeaChange would be delayed, yet nevertheless directed SeaChange to
    continue performance, MSC waived its right to terminate the Contract based
    on such a delay;

j.   Because MSC Because MSC knew that the issuance of a Facility Security

Clearance to SeaChange would be delayed, yet nevertheless directed

SeaChange to continue performance, MSC was equitably stopped from

exercising any right to terminate the contract based upon such delay; and

k.   The behavior of MSC and its position in this dispute is so unjustifiable as to

make appropriate an award of costs and attorneys fees to Plaintiff.

8.      Plaintiff also seeks the entry of judgment in its favor and against Defendant USA

for monetary damages, in an amount to be proved at trial, but not less than $10,000,000.00, owed

for a termination for convenience and breach of contract resulting from the Defendant's

improper termination for default, plus interest, costs, attorney's fees, and such other and further

relief as may be just and proper.

9.      In the alternative, Plaintiff seeks the Court's determination that a binding contract

was never formed between itself and the Defendant due to the failure of a condition precedent,

entitling Plaintiff to recover damages for detrimental good faith reliance and/or quantum meruit.

Plaintiff would then request entry of judgment for monetary damages, in an amount to be proved

at trial, but not less than $10,000,000.00,  plus interest, costs, attorney's fees, and such other and

further relief as may be just and proper.

**FACTS**

10.     In response to a solicitation issued by the Defendant's Military Sealift Command,

Plaintiff SeaChange bid upon and, on 27 March 2014, was awarded contract N0033-14-C-3300

(the "Contract").  A copy of the Contract is attached as "Exhibit A".

11.     In essential part, the Contract required SeaChange to provide and the MSC to pay

for the operation of a vessel for the transportation and prepositioning of certain military cargo

owned or provided by the United States of America.  Such vessel hire arrangements are called Time Charters.

12.     Under the Contract, SeaChange had to obtain from the Defense Security Service ("DSS"), the federal agency which reviews and processes security clearance applications, a SECRET level Facility Clearance (known as an "FCL"), the Facility Security Officer ("FSO") for SeaChange had to obtain a SECRET level personal security clearance, and four officers on the Vessel had to have SECRET level personal security clearances. Security clearances are required because certain communications between the United States Navy and the Vessel's Master pertaining to the Vessel's operations are classified.

13.     The requisite security clearances were not required to be obtained prior to award of the Contract as a condition to submitting a bid.  In fact, SeaChange could not initiate the process for obtaining an FCL prior to having been awarded the Contract because any application for such clearance requires a sponsor, such as MSC, which must initiate the process under the aegis of an issued contract.

14.     The Solicitation resulting in the Contract award stated at Section L-10, Security:

> The performance of this contract requires that the offeror have a SECRET facility clearance granted by a Military Department. *If an offeror has not been granted such a clearance and is otherwise entitled to award, a contract will be awarded contingent upon the offeror receiving a facility clearance within 60 days of notice of award.* If the contractor fails to obtain a facility clearance within the time specified above due to circumstances *within his control*, at the discretion of the Contracting Officer, the contract may be canceled at no cost to the Government.

(Emphasis added.)

15.     The Contract was awarded on March 27, 2014.

16.     Pursuant to Solicitation Section L-10, the award was contingent upon SeaChange receiving a facility clearance by May 26, 2014.

17.     Upon contract award MSC was required to notify DSS of its sponsorship of SeaChange for the requisite security clearances in order for SeaChange to commence the security clearance application process.

18.     Initially, MSC failed to timely submit the proper documentation to the correct DSS office, thereby causing delays in the commencement of the security clearance application process for SeaChange.

19.     Not until two weeks after contract award, on or around April 15, 2014, and only after continued prompting by SeaChange, did MSC finally direct its sponsorship request to the proper DSS office.  Even then, however, the forms required to be submitted by MSC contained incorrect information causing DSS to reject MSC's sponsorship request.

20.     Due to MSC's failures and omissions with respect to its submission of a security clearance sponsorship package, DSS did not formerly open the security clearance application process for SeaChange until April 23, 2014, twenty-seven days after Contract award.

21.     Even without this initial delay, the parties understood there was a short timeline for the FCL application process between the date of Contract award on March 27, 2014 and the date the Vessel was initially scheduled to depart CONUS on June 22, 2014.  Accordingly, at the very first project meeting held on April 8, 2014, SeaChange proposed a back-up plan to MSC in the event the issuance of an FCL by DSS was delayed for any reason.  Specifically, SeaChange proposed to assign vessel management responsibilities and the employment of the required officers with security clearances to its subcontractor, which possessed the requisite FCL, until such time when DSS issued SeaChange its own FCL. In the interim, SeaChange agreed to exclude itself from access to all classified information.  This type of arrangement proposed by

SeaChange as a back-up plan was similar to that which MSC had previously permitted on at least one prior Time Charter, the HSV Westpac Express.

22.     The Contracting Officer, after checking internally within MSC, advised SeaChange that the proposal to utilize its cleared subcontractor on an interim basis was an acceptable alternative in the event delays were experienced by SeaChange in obtaining its own FCL.

23.     Once DSS finally opened the security clearance application process, SeaChange submitted all information required to DSS in a timely manner, fully complied with all requests for information made by DSS, and fully cooperated with the processing of the FCL application. This has been admitted by DSS, MSC's Contracting Officer and MSC's Security Manager.

24.     Unbeknownst to SeaChange, immediately after SeaChange submitted its initial FCL application, DSS informed MSC, on or about May 7, 2014, that because the application indicated indicia of foreign ownership, control and influence ("FOCI") within the ownership and management of SeaChange, the approval of SeaChange's FCL application would be delayed. DSS advised MSC that approval would not be forthcoming before the anticipated date for the Vessel to depart CONUS in June 2014.  In fact, DSS advised MSC that the processing of SeaChange's application would likely extend into July or August 2014, up to two months after the Vessel was initially scheduled to depart.

25.     MSC knew that the Vessel would not be allowed to depart CONUS prior to issuance of a FCL to SeaChange.

26.     MSC purposefully failed to disclose to SeaChange its superior knowledge that a FCL would not be issued by DSS prior to the anticipated Vessel departure date.

27.     MSC induced SeaChange to spend millions of dollars in furtherance of Contract performance despite MSC's knowledge that SeaChange would be unable to timely perform the Contract as a result of the DSS delays in reviewing SeaChange's FCL application.

28.     Had MSC disclosed the extent of the anticipated delays to SeaChange in May 2014, SeaChange would have had sufficient time prior to the anticipated Vessel departure date to address and mitigate the FOCI concerns through, by way of example, a corporate reorganization to exclude all foreign ownership interests.

29.     Had MSC cancelled the Contract in May 2014 due to the then known government delay in approval of SeaChange's FCL application, SeaChange could have saved millions of dollars it incurred over the next several months for the procurement, reflagging, and modification of the Vessel to meet the Contract requirements.

30.     In fact, at the time MSC first learned from DSS that the requisite FCL would not be issued in time for the Vessel to depart as originally scheduled, SeaChange had not yet completed procurement of the Vessel (which was being purchased by SeaChange specifically for purposes of the Contract), and MSC knew that SeaChange had not yet closed the transaction. Yet MSC purposefully failed to advise SeaChange of the extent of the anticipated delays related to the FCL approval in order to induce SeaChange to continue to procure, convert, and ready the Vessel for the government's requirements.  Significantly, the vast amount of dollars invested by SeaChange to modify the Vessel were done to meet government requirements that have no value in the commercial marketplace.

31.     SeaChange, in reliance upon the Contract and at substantial expense exceeding $10,000,000,  procured, converted and prepared the ocean going vessel M/V POSITANO

(subsequently renamed the CAPT DAVID I LYON), with which the specified ocean transportation services could be performed.

32.     SeaChange also diligently followed DSS's guidance throughout the application process to address issues raised by DSS related to the presence of FOCI within SeaChange's chain of ownership.  Following DSS's direction, on June 17, 2014, SeaChange adopted exclusion resolutions to exclude the company's parent companies from access to classified information and restructured the management of the company to mitigate DSS's FOCI concerns.

33.     DSS led SeaChange to believe the management restructuring and adoption of exclusion resolutions to exclude foreign persons from access to classified information would be sufficient to mitigate DSS's FOCI concerns and permit timely issuance of a FCL to SeaChange. Over the next two months, between June 17, 2014 and August 22, 2014, there were no further substantive communications between DSS and SeaChange regarding the FCL application, and SeaChange reasonably assumed that DSS's FOCI concerns had been addressed and mitigated based on the corporate actions adopted on June 17, 2014 at DSS's direction.  Throughout this period, MSC and DSS led SeaChange to believe the only remaining task prior to issuance of the FCL was for SeaChange's Facility Security Officer to complete a final interview with DSS for his personal security clearance.

34.     On August 5, 2014, in fulfillment of its responsibilities under the Contract, as modified, Plaintiff SeaChange delivered the Vessel at a port and place specified by MSC for performance of ocean transportation services and MSC accepted the Vessel on August 8, 2014. At that time and place, the Vessel was in all respects properly manned, equipped, seaworthy and prepared for performance of the ocean transportation services required by the Contract.

35.     Between August 8, 2014 and August 22, 2014, the Vessel was loaded with government cargo and otherwise ready to depart to its destination pending issuance of the FCL to SeaChange.

36.     However, on or about 22 August 2014, SeaChange was advised for the first time that the exclusion resolutions and management restructuring previously implemented by SeaChange at DSS's direction to mitigate DSS's FOCI concerns were not considered sufficient by DSS.  Instead, DSS advised that in order to obtain the requisite FCL SeaChange must enter into an enhanced mitigation instrument with DSS called a Special Security Agreement ("SSA"). Adoption and implementation of an SSA is a process that can take a number of months to complete, and as of the date this requirement was first communicated to SeaChange could not have been completed for the Vessel to timely depart to its destination.

37.     DSS's determination that the FOCI mitigation measures previously adopted by SeaChange at DSS's direction were not sufficient, and that an SSA was required to mitigate DSS's FOCI concerns, was unreasonable, overly burdensome, not rationally based, and otherwise arbitrary and capricious.

38.     On the same day SeaChange was first informed of the SSA requirement, MSC also issued to SeaChange a "Show Cause Notice" in the form attached hereto as Exhibit B.  The Show Cause Notice demanded that SeaChange provide a plan of action to obtain an FCL, even though issuance of a security clearance was outside of SeaChange's control and solely within the control of the United States government.

39.     At the same time, SeaChange learned from MSC that, despite its prior assurances, MSC would not allow SeaChange to implement its back-up plan to utilize its cleared

subcontractor to hire the requisite cleared officers and perform vessel management

responsibilities for an interim period pending issuance of the FCL to SeaChange.

40.     Moreover, unbeknownst to SeaChange, MSC had determined months earlier that

it would not permit SeaChange's proposed back-up plan to be implemented.  But MSC failed to

inform SeaChange of this change, and in fact induced SeaChange to continue performance with

the belief that its proposed back-up plan was an acceptable alternative in the event DSS did not

issue the FCL prior to the date of Vessel departure.

41.     SeaChange understood that if the Vessel was to sail to its destination on MSC's

prescribed schedule, temporary relief would be necessary.  Thus, between 22 August 2014 and 9

September 2014, SeaChange proposed numerous alternatives to MSC for an interim solution to

allow the CAPT DAVID I LYON to immediately embark on its voyage pending SeaChange's

implementation of an SSA acceptable to DSS and DSS's issuance of an FCL to SeaChange.

42.     SeaChange offered to provide MSC with any and all assurances, contractual

commitments or indemnifications required to mitigate any concerns. MSC unreasonably rejected

each and every interim measure proposed by SeaChange. At no point did MSC suggest alternate

solutions with SeaChange or suggest ways in which SeaChange might modify any of its

proposed mitigation plans to allow for temporary relief while SeaChange implemented the SSA.

43.     As of the date of the Show Cause Notice, MSC alone was able to mitigate delays

related to issuance of the requisite security clearance, failed to do so, and failed to remedy the

situation or otherwise act in good faith and fair dealing with respect to the issue.  Indeed, MSC

demanded that to avoid a default SeaChange immediately agree to sell the Vessel and novate

(i.e., assign) the Contract to another contractor.  Simultaneously, MSC was engaged in direct

communications with potential buyers of the Vessel, communications which made the potential sale of the Vessel at a fair market price impossible.

44.     On 9 September 2014, after rejection of every interim measure proposed by SeaChange, MSC issued a notice of default termination, a copy of which is attached hereto as "Exhibit C". The sole instance of "default" cited by MSC in the notice was the alleged failure by SeaChange to obtain the needed security clearance.

45.     Plaintiff SeaChange performed and fulfilled all of its obligations under the Contract within its power and control.

46.     The inability to timely obtain the necessary security clearance was in no way the fault or responsibility of SeaChange and was entirely outside of the control of SeaChange.

47.     On September 9, 2014, MSC unreasonably terminated SeaChange's Contract, allegedly for "default", failed to negotiate with SeaChange in good faith consistent with its obligation of non-interference and cooperation, and acted in bad faith by demanding that SeaChange sell the Vessel and novate the contract to another contractor in order to avoid the default termination.

48.     On October 1, 2014, SeaChange submitted to MSC a certified claim in the amount of $2,298,477.92 for services rendered and accepted, but not paid for by MSC, a copy of which is attached hereto as "Exhibit D".

49.     On December 11, 2014, SeaChange submitted to MSC a certified claim in the amount of $7,917,534.00 for amounts owed under the Contract's cancellation clause and for damages owed due to Defendant's breach of contract, a copy of which is attached hereto as "Exhibit E".

50.     On January 28, 2015, the Contracting Officer issued a Final Decision with respect to SeaChange's certified claim in the amount of $7,917,534.00 denying the claim in full, a copy of which is attached hereto as "Exhibit F".

51.     On January 30, 2015, the Contracting Officer issued a Final Decision with respect to SeaChange's certified claim in the amount of $2,298,477.92, finding SeaChange entitled to only $302,072.33, and subject to the government's right to set-off for its alleged reprocurement costs, a copy of which is attached hereto as "Exhibit G".

52.     On February 27, 2015, the Contracting Officer issued a Final Decision with respect to MSC's claim against SeaChange for excess reprocurement costs in the amount of $936,228.58, a copy of which is attached hereto as "Exhibit H".

53.     On March 30, 2015, SeaChange and Defendant USAs filed a stipulation in this action regarding SeaChange voluntarily withdrawing Counts II, III, IV, V, VI and VII (collectively the "Withdrawn Claims") from its First Amended Complaint without prejudice and subsequently submitting the Withdrawn Claims to the MSC's Contracting Officer for a Final Decision.   *See* D.I. 27 (the "Stipulation Governing the Filing of a Second Amended Complaint").

54.     On April 2, 2015, the Court entered an Order granting the Stipulation Governing the Filing of a Second Amended Complaint.  *See* D.I. 28.

55.     On April 9, 2015, pursuant to the Stipulation Governing the Filing of a Second Amended Complaint, SeaChange submitted the Withdrawn Claims to the MSC's Contracting Officer for a Final Decision by presenting a Third Certified Claim under Contract N00033-14-C-3300, a copy of which is attached hereto as "Exhibit I" (the "Third Certified Claim").

56.     On May 22, 2015, the Contracting Officer issued correspondence in response to SeaChange's Third Certified Claim, returning the claim without action, a copy of which is attached hereto as "Exhibit J".

## COUNT I – WRONGFUL TERMINATION

57.     Plaintiff SeaChange herewith incorporates all allegations of paragraphs 1 through 52 above as if fully set forth herein.

58.     In light of the Contract terms and of all the circumstances set forth above, specifically Plaintiff's fulsome cooperation with all relevant agencies and officials of the United States of America in attempting to secure the requisite FCL, the complete control by the United States of America of the process of issuance of said FCL, and the total compliance by Plaintiff in otherwise performing under the Contract, MSC was totally unjustified in issuing a Termination of the Contract for Default.

59.     By issuing an unjustifiable Termination for Default, MSC, and therefore Defendant USA, breached the Contract.

60.     Plaintiff SeaChange is entitled to a declaration by this Court that the Termination for Default was wrongful, unjustified and constituted a breach of the Contract.  Plaintiff is further entitled to a declaration from the Court that the termination by MSC was actually a Termination for Convenience under the Contract, for which Defendant USA is liable for all consequences and damages suffered by Plaintiff thereby.

61.     Plaintiff SeaChange is also entitled to a declaration that MSC's claim against SeaChange for reprocurement costs resulting from the Termination for Default is denied.

62.     Plaintiff further requests that this Court enter judgment in its favor and against Defendant USA for monetary damages for amounts owed for a Termination for Convenience

under the Contract, in an amount to be proved at trial, plus interest, costs, attorney's fees, and such other and further relief as may be just and proper.

## COUNT II – BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING

63.     Plaintiff SeaChange herewith incorporates the allegations of paragraphs 1 through 52 above as if fully set forth herein.

64.     The United States of America, by its officers, employees and agencies, at all relevant times had full control over the process by which the FCL required by the Contract is to be issued.

65.     MSC knew that DSS would not issue SeaChange the FCL prior to the scheduled Vessel departure date, knew that DSS would not permit implementation of SeaChange's proposed back-up plan to utilize the FCL of its subcontractor as an interim measure, and also knew that SeaChange would not be allowed to commence sailing the Vessel without the required FCL, but MSC nevertheless directed and induced SeaChange to continue performance of the Contract at great expense to SeaChange.

66.     MSC's failure to timely advise SeaChange of its superior knowledge precluded SeaChange from taking timely action to mitigate FOCI concerns when there was still time to implement such action prior to the departure date for the Vessel.

67.     MSC also had numerous means by which alternative solutions to the FCL problem could be resolved, including but not limited to the issuance of a Limited FCL, the waiver of the FCL requirement, or the acceptance of SeaChange's proposal for the temporary substitution of its subcontractor's FCL.

68.     MSC refused and failed to consider and implement any of the possible alternatives and remedies, failed to communicate with DSS when it knew that temporary

remedial measures may be required and instead terminated the Contract for default even though SeaChange had no control or ability to control issuance of the FCL.

69.     In so doing, MSC, and therefore Defendant USA, breached its legal obligation to act in good faith and fairly deal with its contracting partner.

70.     MSC, and therefore Defendant USA, is liable and responsible for all of the consequences of said breach, including damages suffered by Plaintiff.

## COUNT III – BREACH OF DUTY TO COOPERATE

71.     Plaintiff SeaChange herewith incorporates the allegations of paragraphs 1 through 52 above as if fully set forth herein.

72.     The United States of America, by its officers, employees and agencies, at all relevant times had full control over the process by which the FCL required by the Contract is to be issued.

73.     MSC knew that DSS would not issue SeaChange the FCL prior to the scheduled Vessel departure date, knew that DSS would not permit implementation of SeaChange's proposed back-up plan to utilize the FCL of its subcontractor as an interim measure, and also knew that SeaChange would not be allowed to commence sailing the Vessel without the required FCL, but MSC nevertheless directed and induced SeaChange to continue performance of the Contract at great expense to SeaChange.

74.     MSC's failure to timely advise SeaChange of its superior knowledge precluded SeaChange from taking timely action to mitigate FOCI concerns when there was still time to implement such action prior to the departure date for the Vessel.

75.     MSC had numerous means by which alternative solutions to the FCL problem could be resolved, including but not limited to the issuance of a Limited FCL, the waiver of the

FCL requirement, or the acceptance of SeaChange's proposal for the temporary substitution of its subcontractor's FCL.

76.     MSC refused and failed to consider and implement any of the possible alternatives and remedies, and instead terminated the Contract for default even though SeaChange had no control or ability to control issuance of the FCL.

77.     In so doing, MSC, and therefore Defendant USA, breached its legal obligation to cooperate in the performance of the Contract.

78.     MSC, and therefore Defendant USA, is liable and responsible for all of the consequences of said breach, including damages suffered by Plaintiff.

## COUNT IV– BAD FAITH

79.     Plaintiff SeaChange herewith incorporates the allegations of paragraphs 1 through 52 above as if fully set forth herein.

80.     The United States of America, by its officers, employees and agencies, at all relevant times had full control over the process by which the FCL required by the Contract is to be issued.

81.     MSC knew that DSS would not issue SeaChange the FCL prior to the scheduled Vessel departure date, knew that DSS would not permit implementation of SeaChange's proposed back-up plan to utilize the FCL of its subcontractor as an interim measure, and also knew that SeaChange would not be allowed to commence sailing the Vessel without the required FCL, but MSC nevertheless directed and induced SeaChange to continue performance of the Contract at great expense to SeaChange.

82.     MSC's failure to timely advise SeaChange of its superior knowledge precluded SeaChange from taking timely action to mitigate FOCI concerns when there was still time to implement such action prior to the departure date for the Vessel.

83.     MSC had numerous means by which alternative solutions to the FCL problem
could be solved, including but not limited to the issuance of a Limited FCL, the waiver of the
FCL requirement, or the acceptance of SeaChange's proposal for the temporary substitution of
its subcontractor's FCL.

84.     MSC refused and failed to consider and implement any of the possible
alternatives and remedies, demanding instead that SeaChange sell the Vessel and novate the
Contract to another contractor, all the while conducting negotiations with other contractors
making any such sale financially unfeasible.

85.     MSC terminated Plaintiff's contract after admitting that Plaintiff had acted with
diligence in obtaining a Facility Security Clearance, and with full knowledge that such
termination would cause Plaintiff significant and oppressive damages.

86.     In so doing, MSC acted in bad faith.

87.     MSC, and therefore Defendant USA, is liable and responsible for all of the
consequences of said breach, including damages suffered by Plaintiff.

### COUNT V– FRAUDULENT INDUCEMENT/DETRIMENTAL RELIANCE

88.     Plaintiff SeaChange herewith incorporates the allegations of paragraphs 1 through
52 above as if fully set forth herein.

89.     The United States of America, by its officers, employees and agencies, at all
relevant times had full control over the process by which the FCL required by the Contract is to
be issued.

90.     MSC knew that DSS would not issue SeaChange the FCL prior to the scheduled
Vessel departure date, knew that DSS would not permit implementation of SeaChange's
proposed back-up plan to utilize the FCL of its subcontractor as an interim measure, and also
knew that SeaChange would not be allowed to commence sailing the Vessel without the required

FCL, but MSC nevertheless directed and induced SeaChange to continue performance of the Contract at great expense to SeaChange.

91.     Defendant made material misrepresentations and omissions to SeaChange regarding its FCL application, the status and timing of the review of the FCL application by DSS, the acceptability of FOCI mitigation efforts implemented by SeaChange, and the acceptability of SeaChange's proposed back-up plan in the event issuance of the FCL was delayed.

92.     Defendant knew or should have known that its misrepresentations and omissions were false and misleading when they were made, or acted with reckless disregard for whether the misrepresentations and omissions were true when they were made.

93.     Defendant's misrepresentations and omissions were made with the intent of inducing SeaChange to rely on them and, as a consequence, to continue to expend significant sums to procure and convert the Vessel to meet the Contract specifications.

94.     Defendant's misrepresentations and omissions were also made intentionally, recklessly, and/or maliciously.

95.     In justifiable and reasonable reliance on Defendant's misrepresentations and omissions, SeaChange continued Contract performance and expended approximately $10,000,000 to procure, convert and deliver the Vessel for the benefit of the Government.

96.     SeaChange was damaged as a direct and proximate result of its reliance on Defendant's material misrepresentations and omissions.

97.     MSC, and therefore Defendant USA, is liable and responsible for all of the consequences of said breach, including damages suffered by Plaintiff.

## COUNT VI– WAIVER/EQUITABLE ESTOPPEL

98.    Plaintiff SeaChange herewith incorporates the allegations of paragraphs 1 through 52 above as if fully set forth herein.

99.    The Solicitation that resulted in the award of the Contract stated the award of the Contract was "contingent upon the offeror receiving a facility clearance within 60 days of notice of award."

100.    A FCL was not issued within 60 days from notice of award due to no fault of SeaChange.

101.    The delay in the issuance of a FCL was not within SeaChange's control.

102.    The United States of America, by its officers, employees and agencies, knew that DSS would not issue SeaChange an FCL within 60 days of award but failed to act to terminate or cancel the Contract upon gaining such knowledge.

103.    Instead, MSC induced SeaChange to continue performance and expend approximately $10,000,00.00 to procure and convert the Vessel to meet the Contract specifications.

104.    Only after SeaChange delivered a fully compliant vessel did MSC advise SeaChange of the DSS delay in issuance of the required FCL and stated its intention to terminate the Contract for default.

105.    As a result of MSC's failure to terminate or cancel the Contract within 60 days from Contract award, and SeaChange's reliance on MSC's forbearance, MSC waived its right to terminate the Contract for cause based on the FCL delay.

106.    As a result of MSC's failure to terminate or cancel the Contract within 60 days from Contract award, MSC was equitably stopped from exercising its right to terminate the Contract for default based on the lack of a FCL.

107.    Plaintiff is entitled to a declaration from the Court that Defendant waived its right and was equitable estoppped from terminating the Contract for default based on the lack of a FCL, and that the termination by MSC was actually a Termination for Convenience under the Contract, for which Defendant USA is liable for all consequences and damages suffered by Plaintiff thereby.

## COUNT VII– QUANTUM MERUIT/UNJUST ENRICHMENT

108.   Plaintiff SeaChange herewith incorporates the allegations of paragraphs 1 through 52 above as if fully set forth herein.

109.    The Solicitation that resulted in the award of the Contract stated the award of the Contract was "contingent upon the offeror receiving a facility clearance within 60 days of notice of award."

110.    The receipt of an FCL within 60 days of notice of award was a precondition to contract formation.

111.    The failure of the condition precedent resulted in a failure to form a valid and binding contract.

112.    Notwithstanding the failure of the condition precedent, SeaChange expended substantial sums to obtain work, labor, services, material and equipment in order to procure, outfit, equip and deliver a vessel suitable for use in performing the proffered contract.

113.    Defendant requested, caused and directed that SeaChange provide such work, labor, services, material and equipment.

114.    SeaChange conferred a benefit to Defendant by furnishing and supplying the work, labor, services, material and equipment to Defendant.

115.    Defendant accepted, retained and benefitted from the work, labor, services, material and equipment furnished by SeaChange, but unreasonably and unjustifiably refused to pay for same, with knowledge that SeaChange expected to be paid by Defendant.

116.    SeaChange is entitled to payment for this work and benefit to Defendant.

117.    As a direct and proximate cause of the foregoing, SeaChange has been damaged in an amount to be proved at trial, but not less than $10,000,000.

WHEREFORE, SeaChange Projects LLC requests the entry of Declaratory Judgment in its favor finding that (1) the termination of the Contract by Defendant MSC for alleged default was wrongful; (2) the termination should be treated as a Termination for Convenience; (3) the wrongful Termination for Default was a material breach of the Contract; and (4) Plaintiff SeaChange Projects LLC has no liability to Defendant under the Contract.  Plaintiff further requests the entry of a Judgment in the amounts owed, to be specifically determined and proved at trial, for monetary damages owed for a Termination for Convenience and breach of contract, or alternatively, detrimental reliance or quantum meruit damages, and entry of an order forcing Defendant MSC to pay to Plaintiff all costs of suit, including reasonable attorneys' fees, together with all other manner of relief deemed to be just in the premises.

Dated:  June 5, 2015                            BLANK ROME LLP

                                                BY:    */s/Steven L. Caponi*
                                                STEVEN L. CAPONI (I.D. 3484)
                                                ADAM V. ORLACCHIO (I.D. 5520)
                                                JEFFREY MOLLER (*pro hac vice*)
                                                BRIAN GOCIAL (*pro hac vice*)
                                                1201 N. Market Street, Suite 800
                                                Wilmington, DE 19801
                                                Phone:  (302) 425-6418
                                                Fax:  (302) 428-5102
                                                Email:  Caponi@BlankRome.com
                                                Email:  Orlacchio@blankrome.com
                                                *Counsel for Plaintiff SeaChange Projects LLC*